IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| MIAMI YACHT CHARTER, LLC, on behalf of itself and all others similarly situated, | ) ) ) ) | Civil Action No. 2:25-cv-05014-RMG |
| Plaintiffs, | ) ) ) | CLASS ACTION COMPLAINT (Jury Trial Demanded) |
| v. | ) ) |  |
| SAFE HARBOR MARINAS, LLC, and SHM CHARLESTON BOATYARD, LLC, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

Plaintiff, MIAMI YACHT CHARTER, LLC ("MIAMI YACHT"), on behalf of itself and all persons similarly situated (hereinafter collectively "Plaintiff"), submits this Class Action Complaint against Defendants, SAFE HARBOR MARINAS, LLC ("SAFE HARBOR") and SHM CHARLESTON BOATYARD, LLC (SHM CHARLESTON)**,** and alleges the following based on personal knowledge as to allegations regarding Plaintiff and based on information and belief as to other allegations.

INTRODUCTION

1. This is a national class action brought by Plaintiff to assert claims, individually and in its capacity as class representative, against Defendants, SAFE HARBOR MARINAS, LLC ("SAFE HARBOR MARINAS") and SHM CHARLESTON BOATYARD, LLC ("SHM CHARLESTON") (hereinafter collectively "Defendants") seeking monetary damages, restitution, and other relief based on Defendants' deceptive, unconscionable, and systematic overcharging of

1

customers, including MIAMI YACHT and the putative class members, in connection with the defendants' boat servicing operations.

2. SAFE HARBOR MARINAS touts itself as the largest owner and operator of marinas in the United States, providing superyacht servicing to thousands of customers through its 138 marinas located in approximately 24 states. These marinas are all part of the "SAFE HARBOR MARINA" national brand and common corporate management structure, regardless of the particular names utilized at any of the local marina sites. Until its sale on April 30, 2025 to Blackstone Infrastructure for $5.65 billion, SAFE HARBOR MARINAS was a wholly owned subsidiary of a real estate investment trust, Sun Communities, Inc. At all times material, SAFE HARBOR MARINAS has done business based on uniform business practices, standard operating procedures and forms, and protocols implemented across all of its marina locations.

3. Through its recent experiences as a customer of SAFE HARBOR MARINAS, the Plaintiff discovered that Defendants are engaged in a scheme designed to inflate customer invoices through improper "add on" charges. To accomplish this, Defendants initially present customers with a written "work order" to identify the proposed services to be provided by Defendants and the attendant costs. However, after the work is performed, but prior to the vessel hitting the water, an updated and "supersized" work order is later presented for full payment, which adds and includes unauthorized charges for services that bear no relation to actual work performed by Defendants or the costs they incurred. Indeed, Defendants routinely levy a surprise 10% surcharge for work performed by third-party operators that were separately hired by boat owners for services outside the parameters of the subject "work order." Plus, Defendants collect sizeable "environmental charges" from all customers that in reality bear no legitimate relation to Defendants' environmental expenditures to any governmental or official agency. Ultimately,

payment of the inflated invoices is uniformly collected through Defendants' extortionate "cash for splash" policy that mandates that all customers swiftly pay in full the Defendants' inflated bill before their vessels are permitted to leave the marina.

4. Upon information and belief, Defendants' deceptive and unconscionable corporate practices have been consistently used for many years in order to add profits to their bottom line by extracting unauthorized sums from their customers in the same manner, and with the same harm to all members of the putative class. Plaintiff, on its own behalf and for the putative class members challenges these "bait and switch"-type tactics and is entitled to class certification as each of the prerequisites under Rule 23 of the Federal Rules of Civil Procedure is satisfied.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, there are at least 100 members of the putative class, and at least one of the members of the proposed class is a citizen of a different state than Defendants. The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over the Defendants because they continuously and systematically operate, conduct, engage in, and carry on business in South Carolina by owning and operating multiple marinas located in South Carolina. The Court also specific personal jurisdiction over Defendants because the wrongful conduct identified herein arose out of or related to Defendants activities in South Carolina and occurred in this District. Accordingly, Defendants are subject to South Carolina's long arm jurisdiction under S.C. Code § 36-2-803.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) Defendants are subject to personal jurisdiction here, (b) Defendants regularly conduct substantial business and established contacts in this district, and (c) a substantial part of the events, acts or omissions giving rise to the claims asserted occurred and continue to occur in this district.

## PARTIES

8. Plaintiff, MIAMI YACHT CHARTER, LLC ("MIAMI YACHT") is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida. MIAMI YACHT owns a 76-foot San Lorenzo yacht known as the "Vasiliki" that is engaged in the private charter business. Plaintiff and the putative class members were victims of the policies and practices of Defendants as described herein and were harmed by the actions of Defendants.

9. Defendant SAFE HARBOR MARINAS, LLC ("SAFE HARBOR MARINAS") is a Delaware limited liability company with its principal place of business in Dallas, Texas. Defendant SAFE HARBOR MARINAS owns and operates a national marina network that conducts business in at least 24 states, and is controlled by a corporate management team consisting of a Chief Executive Officer, two Executive Vice-Presidents of Operations, two Senior Vice-Presidents of Operations, 15 Regional Vice Presidents, and hundreds of employees to serve its customers across the United States. These marinas provide wet slip and dry storage space, end-to-end vessel services, and other high-end amenities. At all times material herein, all of the marinas operated and conduct business under the centralized direction of SAFE HARBOR MARINAS. So, the company's policies, practices, and procedures at issue were originated, orchestrated, and implemented by, with the participation of, and at the direction of SAFE HARBOR MARINAS.

10. Defendant SHM CHARLESTON BOATYARD, LLC ("SHM CHARLESTON") is a Delaware limited liability company with its principal place of business in Charleston, South Carolina. SHM CHARLESTON is a wholly owned subsidiary of SAFE HARBOR MARINAS and is part of the marina network operated and controlled by SAFE HARBOR MARINAS.

11. Should Plaintiff discover the identities of additional parties that are liable for the wrongdoing set forth herein, Plaintiff will seek leave to amend to add defendants.

## FACTUAL BACKGROUND

12. Defendant SAFE HARBOR MARINAS engages in business nationwide through its marina network, including the marina that does business in Charleston, South Carolina as "Safe Harbor City Boatyard."

13. In late October 2024, Plaintiff's vessel was travelling near Charleston, South Carolina on its way to its home base, which is the Island Gardens Marina in Miami, when it experienced serious engine problems. The vessel was taken to the "Safe Harbor City Boatyard", which is owned and operated by SAFE HARBOR MARINAS.

14. Consistent with the Defendants' national standard operating procedures, Plaintiff was provided a written "work order" prepared by the marina representatives that listed the operation, labor, parts, and total by line item and category for the work to be provided by Defendants to Plaintiff's vessel. The October 25, 2024 work order for $218,505.35 was agreed upon by Plaintiff, and is attached hereto as Exhibit A. Plaintiff was required to pay $50,000 in advance before the vessel repair work could start. Therefore, Plaintiff made a payment via wire transfer for $50,000 to Defendants for the work on November 12, 2024.

15. Thereafter, Defendants' employees and agents started working on the vessel for months in connection with the agreed upon repairs reflected in the October 25, 2024 work order,

which required deconstruction of portions of the vessel (such as the deck, machine room, and other areas) through work performed by Defendants and contractors directly hired by Defendants to accomplish the work described in the work order.

16. Outside and apart from the scope of the Defendants' October 25, 2024 work order, Plaintiff hired independent third-party operators to perform repair services needed by the vessel. In that regard, Plaintiff hired and paid TDW Marine (a Florida diesel engine repair company) for mechanical engine work by virtue of a separate contract with TDW.  When TDW could not complete the engine work, Plaintiff independently hired and paid Smart Diesel (another Florida diesel engine repair company) to complete the engine repairs, again through a separate contract.

17. After substantial and unwarranted delays, Plaintiff was finally advised in March 2025 that the vessel could be ready for an initial sea trial, which was scheduled for April 11, 2025. Through March 31, 2025, Plaintiff had already paid Defendants $188,913.15 per the initial work order.

18. On April 9, 2025, which was two days before the scheduled sea trial, Defendants for the first time demanded delivery of full payment as a condition of permitting the vessel to leave the marina for the sea trial.  Upon review of the newly delivered work order that increased the total to $248,753.55, Plaintiff raised concerns about unauthorized amounts that were not part of the original work order.

19. Despite requests for additional time to address the last-minute demands for increased payment by Defendants, Plaintiff was pressured and mandated to pay based on the company's rigorously enforced "cash for splash" policy.  Consequently, Plaintiff was forced on April 10, 2025 to pay via wire transfer the amount of $ 74,514.30 (which was done under protest)

to Defendants. This was done after Defendants threatened to cancel the April 11, 2025 sea trial needed to return the vessel to service, unless they received the demanded payment in full.

20. After the successful sea trial on April 11, 2025 and completion of some minor teak work, the vessel was ready to leave the marina on May 9, 2025. At that time, Defendants surprisingly delivered a "final" work order demanding even more "add-on" fees and charges that were not authorized by the initial work order or timely disclosed therein. A copy of the final bill showing a new total in the amount of $312,976.76 is attached as Exhibit B.

21. Plaintiff requested additional documentation and attempted to question the final payment demanded by Defendants. In response, Defendants demanded immediate payment and reiterated that consistent with their corporate "cash for splash policy," Plaintiff had to pay the demanded balance because "unless and until full payment was received, the vessel would not be allowed to leave the marina."

22. When Plaintiff complained about SAFE HARBOR MARINAS' extortionate "cash for splash" policy and disputed the demanded amounts, Defendants' representatives again responded with "this is how we do business." So, on May 15, 2025 Plaintiff was forced to pay via wired funds an additional $ 49,699.88 to Defendants (again under pressure and protest) to depart the marina. Plaintiff was desperate to have its vessel released, having already lost substantial revenues during the prolonged repairs that were inordinately delayed by Defendants.

23. After Defendants received the additional $49,699.88, Plaintiff's vessel was allowed to leave the marina on May 16, 2025.

24. Upon later investigation and information, substantial overcharges were identified that Defendants required Plaintiff to pay – which were not authorized by the agreed upon work order and were otherwise deceptive and unconscionable. These include surcharges for work

performed by third-party operators that were separately hired and paid by Plaintiff for services *outside* the parameters of the work order; fictitious charges unrelated to actual services rendered; deceptively labeled "environmental charges" unrelated to any actual environmental expenditures documented for Plaintiff's vessel or paid by Defendants to any governmental entity; and charges for merely preparing the "work orders." These standard policies and practices result in unauthorized and inflated costs and charges without adding anything of value to the customer. This scheme was designed to unfairly create hidden profit centers and lure vessel owners to do business with SAFE HARBOR MARINAS for the sole benefit of the Defendants.

25. As a result, Plaintiff has incurred damages by these wrongful business practices, including being forced to pay inflated and unauthorized add-on charges in excess of $70,000.

## CLASS ALLEGATIONS

26. Plaintiff brings this action on behalf of itself and all others similarly situated pursuant to Federal Rule 23 (b) (3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

27. Plaintiff proposes the following class ("the "Class"):

All customers of SAFE HARBOR MARINAS or SHM CHARLESTON (including individuals, companies, trusts, corporations, partnerships, associations, or other persons) who were a party to a work order and incurred any or all of the following: (a) the surcharge for services by a third-party operator; (b) the "environmental charge," (c) other unauthorized add-on charges (like for merely delivering a "work order"), at any time within the applicable statute of limitation through the date of class certification.

Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or add sub-classes, as necessary, before the Court determines whether certification is appropriate and as the Court may allow.

28. Excluded from the Class are:

    a.    Defendants and any parent, subsidiaries, affiliates, or entities in which Defendants have a controlling interest;

      b.      Defendants' officers, directors, or employees and any of the legal representatives, heirs, successors, or assigns of Defendants;

      c.      The Judge(s) to whom this case or any transferred case is assigned and any member of the Judges' immediate family and any other judicial officer assigned to this case or any transferred case; and

      d.      Any attorneys representing the Plaintiff or the Class.

29. Numerosity - Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members would be impracticable. The Class consists of thousands of members and the identity of those persons is within the knowledge of, and can be ascertained by resorting to, Defendants' records.

30. Commonality - Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.

31. Among the questions of law and fact common to the Class are:

(a) Whether Defendants required customers to enter into a standardized and ambiguous work order in connection with each vessel;

(b) Whether Defendants levy a surcharge to its customers for work by third-party operators that are separately retained and paid by boat owners for services outside the parameters of the subject "work order";

(c) Whether Defendants are authorized to charge a ten (10%) surcharge for work done by third-party operators hired by ship owners and paid by ship owners under the terms of the Defendants' "work order";

(d) Whether Defendants are authorized to collect environmental charges that are not representative of Defendants' actual legitimate environmental expenditures;

(e) Whether Defendants actually pay environmental costs to any governmental or official agency;

(f) Whether the terms of the work order are unconscionable and/or against public policy;

(g) Whether the terms of the work order are deceptive, vague or misleading;

(h) Whether the terms of the work order adequately give written notice of the 10% surcharge to be levied for work by third-party operators that are separately retained by ship owners and paid by ship owners;

(i) Whether Defendants engaged in the scheme alleged in this action;

(j) Whether Defendants engage in the practice of wrongfully inflating its customer invoices to increase profits;

(k) Whether Defendants business practices constitute a breach of the terms of their work order, including the covenant of good faith and fair dealing;

(l) Whether Defendants have been unjustly enriched through the scheme alleged in this action;

(m) Whether the scheme alleged in this action resulted in damages, and the proper method or methods by which to measure damages; and

(n) Whether Defendants can charge ship owners a substantial fee for merely preparing a "work order" when this charge is not disclosed to the vessel owners nor authorized by them.

32. Typicality – Fed. R. Civ. P. 23(a)(3). Plaintiff asserts claims that are typical of the Class it purports to represent, having been a victim who was improperly assessed one or more

surcharges and environmental charges. Plaintiff and the Class members have similarly suffered harm arising from Defendants wrongdoing as alleged in this Complaint.

33. Adequacy of Representation - Fed. R. Civ. P. 23(a)(4); 23(g)(1). Plaintiff is an adequate representative of the Class because Plaintiff fits within the class definition and Plaintiff's interests do not conflict with the interests of the members of the Class that Plaintiff seeks to represent. Plaintiff is passionate about this litigation personally and will prosecute this action vigorously for the benefit of the entire Class. Plaintiff is represented by experienced and able attorneys from a law firm that has previously served as class counsel. Class counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and class counsel can fairly and adequately protect the interests of all of the Members of the Class.

34. Superiority of Class Action - Fed. R. Civ. P. 23(b)(3). The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and members of the Class have suffered irreparable harm because of Defendant's improper, deceptive and unconscionable conduct. Without the class action vehicle, the Class members would need to retain separate counsel at great burden and expense, and effectively have no reasonable remedy, and Defendant would continue to engage in the improper conduct that is the subject of this Complaint. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. There will be no difficulty in the management of this action as a class action.

35. Injunctive and Declaratory Relief - Fed. R. Civ. P. 23(b)(2). Defendant's conduct is uniform as to all members of the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## COUNT I
## BREACH OF CONTRACT
### (On behalf of Plaintiff and Class Members against SAFE HARBOR MARINAS)

36. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 35 as if fully set forth herein.

37. Defendant SAFE HARBOR MARINAS engages in the yacht repair business throughout the United States and in South Carolina.

38. In connection with vessel repairs, SAFE HARBOR MARINAS uses a standard work order that is provided and agreed upon with each vessel owner before work is performed. The local marina name under which it does business is displayed on the work order depending on the marina involved, but the form and terms are uniform pursuant to SAFE HARBOR MARINAS' nationwide standard practices and procedures. Every work order is drafted and prepared by representatives of SAFE HARBOR MARINAS.

39. Plaintiff and the Class members entered into standard work order agreements with SAFE HARBOR MARINAS in connection with each vessel owned by the customers.

40. Defendant materially breached the terms of the work order agreed upon between the parties by overcharging for unauthorized amounts and for hidden fees that were not identified in the work order, not defined in the work order, and not authorized by the vessel owner therein. Defendant did not properly or fully disclose in the written work order that SAFE HARBOR MARINAS would levy a 10% surcharge for any and all work by third-party operators that were

separately hired and paid by a customer for services to the vessel outside the parameters of the subject "work order."

41. Defendant also materially breached the work order by demanding payment for "environmental charges" which were not actual costs incurred in connection with the repairs of the subject vessel.

42. Defendant mischaracterized to its customers that it incurred environmental charges that are being passed along to the customer, when in fact these charges are merely a disguised profit center

43. Defendant does not properly or fully disclose in the work order that environmental charges are not calculated based on costs incurred or to defray actual environmental expenditures relating to the particular work order.

44. Despite the lack of full disclosure or customer agreement for these substantial "add on" surcharges, Defendant demanded full payment thereof from Plaintiff and Class members. Per the Defendant's standard "cash for splash" policy, release of any vessel was refused until all amounts demanded are paid in full.

45. As a result of Defendant's secretive conduct, manufacturing of fictitious charges, and scheme to unfairly and deceptively inflate work orders, Plaintiff and the class members have sustained substantial damages.

**COUNT II**
**BREACH OF CONVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff and Class Members**
**against SAFE HARBOR MARINAS)**

46. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 35, and 38-39 as if fully set forth herein.

47. All contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Evading the spirit of the bargain and engaging in subterfuge constitute examples of bad faith in the performance of contracts. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

48. The implied covenant of good faith and fair dealing requires SAFE HARBOR MARINAS to administer its agreements including the terms regarding charges and fees, fairly and in good faith.

49. To the extent SAFE HARBOR MARINAS has any discretion under the agreement, such action is constrained by the covenant of good faith and fair dealing which prohibits abusive, misleading, oppressive or unconscionable conduct when performing contract powers.

50. Defendant breached the covenant of good faith and fair dealing through its false billing, invoicing and collection policies and practices, as alleged herein, including the extortionate "cash for splash" policy. Not only does Defendant use purposefully ambiguous and misleading terms in its "work order," but the practice of holding a vessel hostage until unauthorized and hidden "add-on" charges are paid in full violates the duty of good faith and fair dealing.

51. Plaintiffs and members of the Classes have sustained substantial damages as a result of Defendant's breaches of the covenant of good faith and fair dealing.

**COUNT III**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and Class Members against**
**SAFE HARBOR MARINAS and SHM CHARLESTON)**

52. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 35 as if fully set forth herein.

53. Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment. This claim is brought in the alternative to other counts asserted. If the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Defendants disgorge all improperly assessed overcharges.

54. Through the wrongful practices alleged herein, Defendants knowingly participated in a scheme designed to inflate the amounts collected from Plaintiff and the Class members in an unfair, deceptive, oppressive, and unconscionable manner.

55. Defendants knowingly received and wrongfully retained benefits and funds from Plaintiff and the Class members and in so doing, Defendants acted with conscious disregard for the rights of Plaintiff and the Class members.

56. Defendants' retention of the funds and benefits therefrom under these circumstances is inequitable and constitutes unjust enrichment. Defendants should be compelled to disgorge to a common fund for the benefit of Plaintiff and members of the Classes all wrongful charges levied by them traceable to Plaintiff and the Class members.

57. As a direct and proximate result, Defendants have been unjustly enriched at the expense and to the detriment of Plaintiffs and Class members.

### COUNT IV
### VIOLATION OF SOUTH CAROLINA STATUTE PROHIBITING UNFAIR TRADE PRACTICES
**(On behalf of Plaintiff only against SAFE HARBOR MARINAS and SHM CHARLESTON)**

58. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 25, as if fully set forth herein.

59. Under applicable law, unfair trade practices are prohibited in connection with the sale of products and services to consumers in South Carolina.

60. Defendants' policies and practices described herein constitute unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce in South Carolina.

61. Defendants' policies, practices, and conduct are unlawful and violate South Carolina Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 et seq.) including the practice of levying unauthorized "add-on" fees, false and deceptive charges, and extortionate collection practices (i.e. "cash for splash" policy). Defendants use purposefully ambiguous and misleading language, demand payment for amounts where no value has been added by Defendants, and demand payment for unauthorized "add-on" charges. These unfair and deceptive acts -- all of which occurred in connection with Defendants' trade and commerce in South Carolina -- had a tendency and capacity to mislead a customer, like Plaintiff, and are offensive to public policy, unethical, unconscionable and oppressive.

62. As alleged herein, Defendants failed to deal with its customer fairly.

63. Defendants' unlawful trade practices affect and have an adverse impact on the public interest as they have already occurred and have the potential for repetition because they are standard and ongoing company practices of Defendants.

64. Defendants have directly, foreseeably, and proximately harmed Plaintiff, who has incurred actual and ascertainable damages as a result of the Defendants' unlawful trade practices for which they are liable.

65. Defendants' use of the unfair and deceptive methods, acts, and practices was a willful or knowing violation of Section 39-5-20, and Plaintiff demands an award of three times the actual damages sustained.

66. In addition, Plaintiff demands an award of reasonable attorney's fees and costs against Defendants pursuant to Section 39-5-140.

## JURY TRIAL DEMAND

Plaintiff and the Class members demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand the following relief and judgment in their favor as follows:

1. Class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and appointment of Plaintiff as representative of the Class, and appointment of the undersigned as Class counsel;

2. Finding liability and entering judgment for breach of contract against Defendant SAFE HARBOR MARINAS, LLC;

3. Finding liability and entering judgment for breach of implied covenant of good faith and fair dealing against Defendant SAFE HARBOR MARINAS, LLC;

4. Finding liability and entering judgment for unjust enrichment against Defendants SAFE HARBOR MARINAS, LLC and SHM CHARLESTON BOATYARD, LLC;

5. Finding liability and entering judgment for violation of South Carolina's Unfair Trade Practices Act against Defendants SAFE HARBOR MARINAS, LLC and SHM CHARLESTON BOATYARD, LLC;

6. Awarding Plaintiff and the Class damages, under Counts I, II, and III;

7. Awarding Plaintiff damages, attorney's fees, and any other appropriate relief under Count IV against Defendants;

8. Awarding any other relief including disgorgement, restitution, declaratory, and injunctive relief to foreclose unlawful ongoing practices by Defendants;

9. Awarding pre-judgment interest at the maximum rate permitted by applicable law;

10. Reimbursing all costs and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees and expenses via a common fund to class counsel or as otherwise permitted by applicable law; and

11. Awarding such other relief as this Court deems just and proper.

DATED this 6th day of June, 2025.

/s/ Mark C. Tanenbaum
Mark C. Tanenbaum, Esq. (Fed Bar No. 4017)
**MARK C. TANENBAUM, P.A.**
1156 Bowman Street, Suite 245
Mount Pleasant, SC 29464
Telephone: (843) 577-5100
mark@tanenbaumlaw.com

Richard A. Harpootlian, Esq. (Fed Bar No. 1730)
**Richard A. Harpootlian, P.A.**
1410 Laurel Street
Columbia, SC 29202
Telephone: (803) 252-4848
rah@harpootlianlaw.com

Cristina M. Peirson, Esq.
**KELLEY | UUSTAL, PLC**
500 N. Federal Highway, Suite 200
Fort Lauderdale, FL  33301
Cristina M. Pierson, Esquire
Florida Bar No. 984345
cmp@kulaw.com
madeleine@kulaw.com
*Pro Hac Vice Admission Pending*