**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Miami Yacht Charter, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Safe Harbor Marinas, LLC, and SHM Charleston Boatyard, LLC,<br><br>Defendants. | Case No. 2:25-cv-5014-RMG<br><br><br>**ORDER AND OPINION** |

Before the Court is Defendants' motion to compel arbitration and to stay pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq. For the reasons stated below, the Court grants the motion.

## Background

Plaintiff Miami Yacht Charter, LLC sued Safe Harbor Marinas, LLC ("SHM") and SHM Charleston Boatyard, LLC (the "Boatyard") in federal court for Defendants' alleged "deceptive, unconscionable, and systematic overcharging of customers . . . in connection with the defendants' boat servicing operations." (Dkt. No. 1 at 1–2). Miami Yacht brings a putative class action.

Miami Yacht alleges that its vessel, the M/Y *Vasiliki*, experienced engine problems in October 2024, and that the boat was "taken to the Safe Harbor City Boatyard, which is owned and operated by [SHM]." (*Id.* at 2). Miami Yacht alleges that per the October 25, 2024, work order, it was to pay $218,503.55 for the repairs, but that it was forced and pressured to pay far more. (*Id.* at 5–7). Miami Yacht alleges it incurred damages because of "wrongful business practices, including being forced to pay inflated and unauthorized add-on charges." (*Id.* at 8).

1

After Miami Yacht filed the complaint, Defendants move to compel arbitration and to stay this matter pending arbitration. (Dkt. Nos. 14, 25). Miami Yacht opposes. (Dkt. No. 22).

The record shows that around October 16, 2024, Timothy Claus, a technical superintendent for Fraser Yachts Florida, Inc., contacted the Boatyard to discuss repairs to the *Vasiliki*. Ryan DiPasquale Affidavit, (Dkt. No. 14-2 ¶ 6) (Boatyard General Manager). Fraser provides "brokerage services to yacht owners, including safety, technical, insurance, crew, and project management services." (Dkt. No. 14-1 at 7 n.1). Claus "manag[ed the] *Vasiliki*." (Dkt. No. 14-8 at 6) (email from Claus to the Boatyard copying Peter Palivos, Miami Yacht's General Counsel).

Claus represented that he was the authorized agent for *Vasiliki*'s owner, Miami Yacht. (Dkt. No. 14-2 ¶ 6). The Boatyard also communicated with Peter Palivos, who represented that he was the *Vasiliki*'s owner and Miami Yacht's general counsel. (*Id.* ¶ 7).

The Certificate of Liability supplied to the Boatyard for the *Vasiliki* states that the insured is "Miami Yacht Charter LLC" and that the certificate holder is "Safe Harbor Marinas, LLC [a]nd all of its Affiliates and Subsidiaries." (Dkt. No. 14-2 at 2).

On October 18, 2024, Claus completed a Haul and Service Agreement ("HSA") for the *Vasiliki*. (Dkt. No. 14-5 at 1–8) (noting "Customer Name" as "M/Y *Vasiliki* c/o Fraser Yachts Florida, Inc."). And on October 21, 2024, the *Vasiliki*'s captain Kevin Orwig executed a Credit Card Authorization for the HSA, indicating the customer was Gregory Palivos. (Dkt. No. 14-6 at 5). Gregory was Miami Yacht's Manager. Gregory Palivos Affidavit, (Dkt. No. 22-1 at 2).

The HSA contains an arbitration clause stating that, "Any and all disputes of any type whatsoever relating to or arising out of this Contract shall be resolved through binding arbitration." (Dkt. No. 14-5 at 8). Further, an "HSA must be executed before any work identified in the work

2

order commences" at the Boatyard. (Dkt. No. 14-2 ¶ 12). "This is a [Boatyard] policy and practice and . . . is a standard process in the industry." (*Id.*).

The Boatyard issued numerous Work Orders, including the Work Order which is the basis for Miami Yacht's lawsuit. (Dkt. No. 14-2 at 3); (Dkt. No. 1-1) (Work Order for $218,505.35); (Dkt. No. 14-7) (Final Work Order for $233,856.35).

On April 9, 2025, "the Boatyard sent Miami Yacht an invoice, copying Fraser Yachts, for the remaining amount owed." (Dkt. No. 14-2 ¶ 15). "Miami Yacht complained about the invoice" and the Boatyard "agreed to write off approximately $27,000 of charges as a gesture of goodwill." (*Id.*). On May 9, 2025, the Boatyard issued its final invoice to Miami Yacht. (*Id.* ¶¶ 16–17).

Included in the record with the copy of the final invoice is a chain of emails from Peter Palivos and Claus to the Boatyard discussing the repairs to the *Vasiliki*. (Dkt. No. 14-8 at 2–7) (noting Palivos of Miami Yacht spoke to Boatyard employees personally and that "we are preparing to depart Charleston by May 15, 2025"). Palivos' email signature states he is "General Counsel, Maimi Charter Yacht LLC." *E.g.*, (*id.* at 3).

Also, in his April 30, 2025, email to the Boatyard, Palivos stated that "we entrusted the repairs of our vessel to Safe Harbor." (*Id.* at 5). And that Miami Yacht "relied on the timeline that Safe Harbor gave to us because Frasher Yacht – which is our tech consultants – informed us that safe Harbor has a good reputation for meeting timelines." (*Id.* at 4)

In his March 13, 2025, email in the above chain, with Peter Palivos copied, Claus stated he is the "Technical Superintendent **managing M/Y Vasiliki**." (*Id.* at 6) (emphasis added). When discussing the *Vasiliki*, Clause uses the pronoun "we": "As you know, **we** have had [the *Vasiliki*] in your yards for three-months over schedule." (*Id.*) (emphasis added).

Defendants' motion is ripe for disposition.

3

**Legal Standard**

A litigant may compel arbitration under the FAA if it can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). Once a litigant moves to compel arbitration under the FAA, the district court determines whether a matter should be resolved through arbitration depending on (1) whether a valid arbitration agreement exist and (2) whether the dispute falls within the substantive scope of the arbitration agreement. *AT&T Tech. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986). The Supreme Court has consistently encouraged a "healthy regard for the federal policy favoring arbitration." *Levin v. Alms and Associates, Inc.*, 634 F.3d 260, 266 (4th Cir. 2011).

"Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997). Section 4 of the FAA requires the district court to "decide whether the parties have formed an agreement to arbitrate." *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 n.9 (2019). The question of whether an arbitration agreement has been formed is one of contract law, and ordinary state law principles apply. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). When a party "unequivocally denies 'that an arbitration agreement exists,' " that party bears the burden of coming forward with "sufficient facts" to support her position. *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 234. The standard to decide whether the party has presented "sufficient facts" is "akin to the burden on summary judgment," and the court may consider matters outside the pleadings. *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). The trial

provision of Section 4 is invoked only where "the record reveals a genuine dispute of material fact 'regarding the existence of an agreement to arbitrate.' " *Berkley Cnty. Sch. Dist.*, 944 F.3d at 234. Where there is no genuine dispute of material fact an agreement exists, the court will compel arbitration.

Also relevant is the question of "arbitrability." Whether an underlying controversy will proceed to arbitration on the merits "necessarily falls within the narrow circumstances of arbitrable issues for the court to decide." *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 874 (4th Cir. 2016). Namely, "it is well established that whether the parties have submitted a particular dispute to arbitration is 'undeniably an issue for judicial determination[ ] [u]nless the parties clearly and unmistakably provide otherwise.' " *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

## Discussion

For the reasons explained herein, Miami Yacht's claims must be arbitrated on an individual basis against both Defendants.[1]

---

[1] In their motion, Defendants argue that equitable principles entitle SHM to compel Miami Yacht to arbitrate its claims against it even though SHM is not an explicit party to the HSA. (Dkt. No. 14-1 at 15–20). Miami Yacht presented no substantive opposition to this argument. Instead, it claimed that because "there is no enforceable arbitration agreement relating to either defendant," SHM's entitlement to enforce the HSA was "rendered moot." (Dkt. No. 22 at 4 n.2). Miami Yacht is wrong, there *is* an enforceable arbitration agreement. And, by failing to respond substantively to the noted point, Miami Yacht has abandoned its chance to oppose Defendants' argument. *See Pueschel v. United States*, 369 F.3d 345, 353–54 (4th Cir. 2004).

Relatedly, the Court finds that SHM is indeed entitled to enforce the HSA against Miami Yacht. *See, e.g.*, *Wilson v. Willis*, 426 S.C. 326, 343–44 (2019) (discussing direct-benefits estoppel, noting that "direct benefits estoppel requires that a nonsignatory knowingly accept the benefits of an agreement with an arbitration clause in order to be bound by an arbitration clause"); (Dkt. No. 14-1 at 16–17) (explaining that Miami Yacht seeks to hold HSM liable under the HSA and arguing it "would be unjust to allow Miami Yacht, on the one hand, to seek to enforce the HSA against SHM, but, on the other hand, refuse to permit SHM to enforce the Arbitration Agreement that is integral

First, elements 1 and 4 are satisfied—a dispute exists between Miami Yacht and Defendants and Miami Yacht refuses to arbitrate. Further, the HSA affects interstate commerce and is also a maritime contract. *See* 9 U.S.C. § 1 (defining "Maritime transactions" "as . . . charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels"); *Id.* § 2 ("A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4."). So, element 3 is satisfied too.

As to element 2, the Court looks to South Carolina law to determine if an agreement exists between the parties requiring arbitration.

"Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002); *Hutchins v. Primerica Life Ins. Co.*, No. CV 7:16-3678-HMH, 2017 WL 11426872, at *4 (D.S.C. Jan. 4, 2017) ("In contract actions, South Carolina will apply the substantive law of the place where the contract was formed when the contract's formation, interpretation, or validity is at issue."); *see also Johnson v. Continental Fin. Co., LLC*, 131 F.4th 169, 178 (4th Cir. 2025). In South Carolina, "A valid and enforceable contract requires a meeting of the minds between the parties with regard to *all* essential

---

to that very contract"); *see also* (Dkt. No. 14-1 at 17–18) (discussing concerted-misconduct estoppel).

and material terms of the agreement." *Black v. St. Francis Hosp., Inc.*, No. 6:24-CV-04888-JDA-KFM, 2025 WL 840878, at *5 (D.S.C. Feb. 28, 2025), *report and recommendation adopted*, No. 6:24-CV-04888-JDA-KFM, 2025 WL 833835 (D.S.C. Mar. 17, 2025).

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *Hodge v. UniHealth Post-Acute Care of Bamberg, LLC*, 422 S.C. 544, 564, 813 S.E.2d 292, 303 (Ct. App. 2018). "An agreement may result in the creation of an agency relationship although the parties did not call it an agency and did not intend the consequences of the relationship to follow. Agency may be proved by circumstantial evidence showing a course of dealing between the two parties." *Id.*

"In an actual agency case, the question is not whether the purported principal could have exercised control over its agent, but whether it did so." *Jamison v. Morris*, 385 S.C. 215, 222, 684 S.E.2d 168, 171 (2009); *see also Cowburn v. Leventis*, 366 S.C. 20, 39, 619 S.E.2d 437, 448 (Ct. App. 2005) ("The test to determine agency is whether or not the purported principal has the *right to control* the conduct of the alleged agent." (quoting *Fernander v. Thigpen*, 278 S.C. 140, 144, 293 S.E.2d 424, 426 (1982))).

"To create apparent authority, the principal must speak, write, or otherwise act toward a third party." *Gallipeau v. Renewal by Andersen LLC*, 742 F. Supp. 3d 508, 518 (D.S.C. 2024); Restatement (Third) Of Agency § 3.03 cmt. b (2006) ("[A]n agent's apparent authority originates with expressive conduct by the principal toward a third party through which the principal manifests assent to action by the agent with legal consequences for the principal."); *see also Moore v. N. Am. Van Lines*, 310 S.C. 236, 423 S.E.2d 116, 118 (1992) ("The basis of apparent authority is representations made by the principal to the third party and reliance by the third party on those

representations."). "Apparent authority is present only when a third party's belief is traceable to manifestations of the principal. The fact that one party performs a service that facilitates the other's business does not constitute such a manifestation." *Gallipeau*, 742 F. Supp. At 518.

The Court finds that Fraser was Miami Yacht's agent. At the least, Fraser had apparent authority to bind Miami Yacht. Put simply, Miami Yacht and Claus of Fraser acted jointly and simultaneously to procure repairs for the *Vasiliki*.

Fraser managed the *Vasiliki* for Miami Yacht and communicated with the Boatyard to repair the vessel. The Certificate of Insurance supplied contemporaneously with Claus' and Palivos' communications with the Boatyard indicated Miami Yacht owned the *Vasiliki*. Further, Peter Palivos communicated with the Boatyard and represented that he was "an owner and general counsel of Miami Yacht." (Dkt. No. 14-2 at 3). Tellingly, when Claus completed the HSA for the *Vasiliki*, he copied Peter Palivos asking Peter to "add the credit card information" because Claus had "completed everything" else. (Dkt. No. 14-5 at 2). And later, when disputes arose, Peter and Claus jointly emailed the Boatyard, reinforcing Miami Yacht's assent to Fraser's actions on its behalf.

In sum, Miami Yacht only obtained services for the *Vasiliki* because of Fraser's actions, actions which Miami Yacht directly and openly approved. Fraser had apparently authority to bind Miami Yacht, which it did. No question of material fact exists on this matter, and Miami Yacht is not entitled to a trial on this point. So, Miami Yacht is subject to the HSA and its arbitration clause.

Further, the Court finds that Miami Yacht's claims clearly arise from the HSA and the services provided thereunder. *See generally* (Dkt. No. 22 at 4 n.2) (failing to substantively oppose Defendants' argument that Miami Yacht's claims fell within the arbitration provision and arguing only that this point is "moot" because "there is no enforceable arbitration agreement").

To the extent Miami Yacht claims the arbitration provision is unconscionable, this argument is unpersuasive. (Dkt. No. 22 at 8–11) (arguing for unconscionability because HSA was a "take-it-or-leave-it" contract and one-sided).

The FAA provides that a party "may seek revocation of a contract under 'such grounds as exist at law or in equity,' including fraud, duress, and unconscionability." *Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302, 305 (4th Cir. 2001) (quoting 9 U.S.C. § 2). Unconscionability is a narrow doctrine whereby the challenged contract must be one which no reasonable person would enter into, and the " 'inequality must be so gross as to shock the conscience.' " *L & E Corp. v. Days Inns of America, Inc.,* 992 F.2d 55, 59 (4th Cir. 1993) (quoting *Smith Bros.–McCleary–McClellan Co. v. Beresford,* 128 Va. 137, 104 S.E. 371, 382 (1920) (internal quotations omitted))

In South Carolina, "[u]nconscionability has been recognized as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 554, 606 S.E.2d 752, 757 (2004). "Absence of meaningful choice on the part of one party generally speaks to the fundamental fairness of the bargaining process in the contract at issue." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 25, 644 S.E.2d 663, 669 (2007) (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 295 (4th Cir. 1989)). "Traditionally, a finding of unconscionability 'requires a showing of both substantive unconscionability, or unfairness in the contract itself, and procedural unconscionability, or unfairness in the bargaining process.' " *Hosey v. Quicken Loans, Inc.,* No. 1:17-cv-02060, 2018 WL 1471891 (D.S.C. Mar. 26, 2018) (quoting *McFarland v. Wells Fargo Bank, N.A.,* 810 F.3d 273, 277 (4th Cir. 2016)).

The Court finds that the HSA is not unconscionable. As to procedural unconscionability, the record evidence shows that Miami Yacht and Fraser willingly accepted the HSA's terms, that Miami Yacht possessed the business judgment necessary to understand the HSA (especially given its general counsel represented it in dealings with the Boatyard), and that Miami Yacht was not under duress when it signed the HSA. Further, the agreement is not substantively unconscionable. While Miami Yacht cites to various provisions of the HSA, (Dkt. No. 22 at 11) (referring to "Limitation of Liability," "Entire Agreement and Liability," "Limitations on Warranties,"[2] "Collection," and "Indemnification"), Miami Yacht never explains with specific argument and record citations *why* these provisions are unconscionable. Said differently, Miami Yacht's arguments are conclusory, and the Court rejects them.

Last, Miami Yacht must individually arbitrate its claims.

In *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 874 (4th Cir. 2016), the Fourth Circuit held that " 'unless the parties clearly and unmistakably provide otherwise,' whether an arbitration agreement permits class arbitration is a question of arbitrability for the court." *Id.* at 876 (quoting *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 597–99 (6th Cir. 2013)). So, this Court determines whether the HSA permits class arbitration.

The Supreme Court has held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010).

---

[2] By way of example, the "Limitations on Warranties" provision states that the Boatyard is not responsible for any warranty claim that "is not made in writing within ninety (90) days of the date the Owner is notified the work is completed." Miami Yacht never explains why this provision, or *any* cited provision for that matter, renders the HSA unconscionable. Miami Yacht's response in opposition to Defendants' motion was the place to make such an argument, which Miami Yacht has failed to do.

> An implicit agreement to authorize class-action arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. That is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.

*Id.* at 685; *see Del-Webb*, 817 F.3d at 875–76 (explaining in detail the differences between bilateral and class arbitration).

The Court holds that the HSA does not permit class arbitration. The HSA's arbitration provision does not mention class arbitration. Rather, it focuses on "[a]ny and all disputes of any type whatsoever relating or arising out of *this Contract*." (Dkt. No. 14-5 at 8) (emphasis added). And the HSA's subject matter is not Defendants' obligation to *other* boatowners. It's Defendants' obligations to *Miami Yacht*. *See Del Webb Communities, Inc. v. Carlson*, No. 9:14-CV-1877-PMD, 2017 WL 1050139, at *2 (D.S.C. Feb. 1, 2017), *aff'd*, 698 F. App'x 761 (4th Cir. 2017) (holding home purchase agreement did not permit class arbitration for similar reasons).

## Conclusion

For the reasons stated above, the Court **GRANTS** Defendants' motion to compel arbitration (Dkt. No. 14) and **STAYS** this action in favor of arbitration.

s/ Richard Mark Gergel<br>
Richard Mark Gergel<br>
United States District Judge

October 31, 2025
Charleston, South Carolina